IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCOS AMPARO, | No. C 09-0801 MMC (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |
| v. | |
| MIKE McDONALD, Warden, | |
| Respondent. | |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Marcos Amparo, challenging the validity of a judgment obtained against him in state court.[1]  Respondent has filed an answer to the petition. Petitioner has not filed a traverse.

**I. PROCEDURAL HISTORY**

In 2005, a Monterey County jury found petitioner guilty of two counts of attempted murder, two counts of attempted murder of a public official, two counts of assault with a firearm on a peace officer, one count of shooting at an occupied motor vehicle, one count of

---

[1] Petitioner initially named Darrell Adams, former warden of Corcoran State Prison, as the respondent in this action. Petitioner later notified the Court he had been transferred to RJ Donovan State Prison, and the warden thereof, G. Neotti, was substituted as respondent. The California Department of Corrections online inmate locator service shows petitioner has been transferred to High Desert State Prison ("HDSP"). Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mike McDonald, the current warden of HDSP, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian. Petitioner is reminded he must keep the Court and all parties informed of any change of address.

taking a vehicle without the owner's consent, one count of evading a peace officer, one count of possession of ammunition by a felon, one count of carrying a loaded firearm, one count of possession of a firearm by a felon, and three counts of second degree robbery. (Ex. 1 at 389-92.)[2] The jury also found true various enhancements based on firearm use and membership in a street gang. (Id.) On February 14, 2006, the trial court sentenced petitioner to a term of 60 years plus 15 years to life in state prison. (Id. at 556.)

On August 23, 2007, in a reasoned opinion, the California Court of Appeal affirmed the judgment, with minor modifications to correct the abstract of judgment. (Ex. 3 at 36-37.) On September 14, 2007, the California Court of Appeal denied a petition for rehearing. (Ex. 5.) On November 28, 2007, the California Supreme Court summarily denied the petition for review. (Ex. 7.)

On February 24, 2009, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

> Defendants'[3] July 2004 crimes, which came to the authorities' attention, began on July 17 with the theft of a parked white 1991 Honda Accord belonging to Angel Rocha and ended on July 27, when they crashed Rocha's car while attempting to evade Officers [Jeremy] Bowen and [Quincy] Gowenlock by fleeing at over 100 miles per hour and shooting at them during the pursuit. Between July 17 and 27, on July 20, they stole a parked 1991 Plymouth van belonging to Maria Meneses and carjacked a blue 1993 Ford Escort from Jose Trinidad Chavez after they put a gun to his head, took his wallet containing $400, and pushed him and threatened to kill him. On July 21, they robbed two clerks working at a Salinas 7-Eleven at gunpoint, and on July 23, [petitioner] robbed a clerk at the Salinas Valley Truck Stop also at gunpoint.
>
> . . .
>
> After the arrest, officers found a loaded revolver, five spent casings, gloves, a blue bandanna, and a glass methamphetamine pipe in the Honda. The ignition had been "punched" so it could be started without a key. A gunshot residue test confirmed that shots had been fired from the sunroof area.

---

[2] All references herein to exhibits are to exhibits submitted by respondent in support of the Answer.

[3] All references to "defendants" in the Court of Appeal's opinion are to petitioner and his co-defendant, Jose Monsivais.

2

Detective Sheldon Bryan of the Salinas Police Department interviewed CHP Officers Bowen and Gowenlock as well as defendants after the chase. Gowenlock and Bowen observed a Honda traveling about 90 miles per hour on northbound Highway 101 at Salinas while they were en route to a noninjury accident call. They were traveling at 90 miles per hour and were not gaining on the Honda. Gowenlock accelerated to about three-to-four car lengths of the Honda, noted it was doing 93 miles per hour in a 65-mile-per-hour posted area, and decided to pull it over to issue a speeding citation.

When Gowenlock activated the lights, the driving of the Honda became erratic, weaving within the lane. It did not pull over. When he activated the siren, the vehicle moved across the slow lane and onto the Boronda Road off-ramp. Although the Honda slowed for a red light at the bottom of the ramp, fire and sparks were shooting out from the front tires and the vehicle went through the red light and turned right onto Boronda Road.

The Honda went through another red light at about 70 miles per hour and onto San Juan Grade Road where it accelerated to about 100 miles per hour. The front passenger, Monsivais, stood up through the sunroof, turned toward the pursuing officers, and Gowenlock saw four or five orange muzzle flashes aimed in their direction. Gowenlock backed the patrol car off from 40 to about 100 feet behind the Honda and saw the passenger resume his seat. After passing two more intersections, the passenger stood up and fired off another four to five shots and then sat down again. Gowenlock did not see or hear any of the shots striking the CHP vehicle. The officers did not fire at the Honda. The Honda was going over 100 miles per hour, crossing over the double yellow lines, and going the wrong way a couple of times. It was around 3:00 a.m. and there was no other traffic. When the driver, [petitioner], came to the T-intersection at Williams Road, he tried to make a turn, but was going too fast and ran straight through the intersection and crashed into an embankment.

When Gowenlock saw the Honda's wheels lock and start into a skid before crashing, he stopped the patrol car just before the intersection. He saw both of the Honda's front doors open and both occupants get out and start to run toward the City of Salinas. Bowen yelled at [petitioner and Monsivais] to get down on the ground and they did. Defendants were detained until the Salinas police arrived to arrest them. The CHP vehicle was turned over to the Salinas Police Department for forensic examination.

[Petitioner] was transported to the Salinas Police Department by Officer Michael Rodden who found a .357-caliber bullet in [petitioner's] pocket. Detective Bryan interviewed [petitioner]. [Petitioner] said that he "borrowed" the car involved in the chase and that he was the driver. He knew that the CHP officers were trying to stop him, but he continued to travel at about 130 miles per hour. He had no intention of stopping and said he was "running from the police." He knew there was a gun in the car and he had handled it earlier that day. When he crashed the car, he and Monsivais fled from the police on foot. He said he associated with Sureño gang members and that he had joined the gang at age 11.

Monsivais told Bryan in a videotaped interview that he had shot at the CHP officers from a stolen car during the chase. He stood up through the "moon roof," "blasted at" the officers, and tried to shoot them. The first time he sat back down in the car, it was to reload the gun. He said he did not like cops and that if he had hit one of the officers, he would gain respect from his fellow

3

gang members. Monsivais admitted stealing the blue Ford Escort which Bryan later learned was car-jacked from Jose Trinidad. When the car was recovered, someone had burned the Sureño gang numbers "X3" and "13" in the headliner.

When Monsivais testified at trial, he stated he was high on methamphetamine during the chase, and continued smoking it from a glass pipe until just before the crash. When he saw the CHP officers try to pull [petitioner] and him over, he was scared because [petitioner] was on parole. He fired at the officers in an attempt to scare them into breaking off their pursuit. He was aiming "on top of the lights" of the patrol unit. He thought all of the bullets had missed the patrol car. He realized he could have hit the officers, but his intent was to shoot over the lights of the car, not at the windshield or directly at the officers. When he sat down after firing the first round of shots, it was to reload. The second time he sat down, he resumed smoking methamphetamine. When he was interviewed by Bryan, he was "under the influence," "accelerated," and "panicked." When he told Bryan he was trying to shoot at the police, he did not mean he was trying to hit the car, he was only trying to scare the officers.

Monsivais's fingerprint was found on the driver's side door of the blue Plymouth van when it was found abandoned in Salinas two days after the July 20 theft and it contained a compact disc with "Sureño type songs" and "13" written on it. Monsivais told officers he bought the van from an acquaintance and said that it was later stolen from him but he made no police report.

Monsivais told Bryan that he went to the 7-Eleven in a stolen car whose keys he found on the street, and which he abandoned after it broke down. He saw it parked somewhere else later and thought it must have been returned to its owner. Monsivais said the car was a small blue Ford with a unique sticker on one of the windows. Monsivais said when he entered the 7-Eleven, he put the gun on the counter, "ordered" money from the clerk, got $200, and left.

Bryan visited the 7-Eleven store in Salinas where two clerks were robbed on July 21. Damasio Bochas, the only clerk who testified, stated he could not identify anyone as his back was turned to the counter during the robbery and he was afraid to turn around.

Bryan viewed the surveillance camera recording. He clearly saw Monsivais on the tape, but the robbery did not occur exactly as Monsivais had said. Two men were involved. A very large man with Monsivais was the person who was armed with the gun. This "individual put the gun down on the counter just like Monsivais said he did and then the exchange of money occurred and then both individuals ran out of the store."

Bryan said he could clearly see Monsivais's face on the video (Monsivais had not worn any kind of mask, hat, or disguise), and that [petitioner] was the second man. He could not identify [petitioner] by face, but he believed the man on the videotape was [petitioner] because he was "an extremely large man. Very tall. Heavy set. He had a baseball cap pulled down very low over his eyes concealing his face. Slumped shoulders." Bryan was certain of the identification because of "the characteristics of the robbery that occurred at the Valley Truck Stop, the details about setting the gun down on the counter, the hat being pulled down low over his eyes to conceal his face, blue jacket. Everything was the same as far as the MO [modus operandi] regarding that robbery and the 7-Eleven – I just couldn't see his face because of the baseball cap bill."

>The Valley Truck Stop robbery had come to Bryan's attention after talking to Monsivais when he researched criminal patterns of past robberies within the Salinas Police Department data base. He learned that the suspect in the Valley Truck Stop robbery was a large-framed man with a baseball cap pulled down. He contacted the victim, Sylvia, who described the robber as a tall man, 6 foot 1 or 6 foot 2 about 230 pounds. He was wearing a baseball cap, a dark windbreaker-like jacket, and dark, possibly blue, pants. She could see his face because although he "was wearing [the cap] pretty low down . . . he was trying to cover up some of his face[,] but him being so tall and me being so short, I could see straight up in his face. Still he did pull it down a little bit." Sylvia gave the officers the videotape of the Valley Truck Stop robbery.
>
>Bryan showed Sylvia a photo lineup. She identified [petitioner] and said, "[i]t had to have been him. I didn't recognize no one [*sic*] else." Sylvia also identified [petitioner] in court. She stated she recalled in particular "the way his face was . . . kind of to the side or something he kind of like moved his mouth and nose kind of to the side or I don't know if that's the way he normally is or if he makes those faces." His nose was "[t]wisted or something."
>
>Bryan showed the 7-Eleven clerks the photo lineup but they were unable to identify anyone. Bryan stated the recording of the 7-Eleven robbery could not be retrieved off the hard drive "for some reason. There was a technical issue and we could not get that burned on a disk."
>
>At trial, Salinas Police Officer Royce Heath testified as an expert on California gangs. He described five predicate felony convictions committed by Sureño street gang members between 2002 and 2004 which established a "pattern of criminal gang activity." (Pen.Code, § 186.22, subd. (e).) In 2002, Miguel Rivera was convicted of murder and a gang enhancement on April 17 and Jorge Quiroz was convicted of two robberies with gang enhancements on October 19. In 2004, Jose Perez was convicted of assault with a firearm with a gang enhancement; Javier Navarro was convicted of car theft and possession of a gun with a gang enhancement on July 27; and Jesús Chuca was convicted of shooting at an occupied vehicle with a gang enhancement on October 18.
>
>Heath stated the Salinas police had several contacts with Monsivais from 2001 to 2004, which established his membership in the Sureño gang. In Heath's opinion, the crimes at issue were committed in furtherance of or for the benefit of the Sureño gang and enhanced the reputation of the gang as well as of the individual gang member.
>
>Heath explained that the possession of a weapon helps gang members commit crimes such as robberies, by instilling fear and causing intimidation, and gives them the means to protect themselves from rival gang members, and to assault police officers. The theft of vehicles provides gang members with transportation without the expense of registering, insuring, and maintaining a vehicle, and gives them the ability to obtain funds, commit other crimes such as robberies, and evade police[,] making identification difficult if the occupants get away. Robberies, as of the clerks at the 7-Eleven and Valley Truck Stop, provide funds to support individual gang members for living expenses and personal habits both inside and outside of jail, and provide an ability for gang members to "party" and have a good time without using their personal funds.

(Ex. 3 at 1-9 (footnotes omitted).)

5

## III.  DISCUSSION

A. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme

Court's jurisprudence.  "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, the only state court to address the merits of petitioner's claims was the California Court of Appeal on direct review.  (Ex. 3.)  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.   Petitioner's Claims

Petitioner asserts the following claims for relief: (1) there was insufficient evidence to support his convictions on the attempted murder, shooting at an occupied vehicle, and assault charges; (2) his trial counsel was constitutionally ineffective for failing to object to Detective Bryan's identification of petitioner from the 7-Eleven surveillance tape; (3) the admission of a statement by petitioner's brother violated petitioner's Sixth Amendment Confrontation Clause rights; and (4) there was insufficient evidence to support the predicate offenses required for conviction on the gang enhancements.  The Court addresses each claim in turn.

1.   Sufficiency of Evidence: Aiding and Abetting

Petitioner, who did not personally shoot at the CHP officers, claims there was insufficient evidence to support his convictions on the attempted murder, shooting at an occupied vehicle, and assault charges because there was no evidence of petitioner's aiding and abetting Monsivais, beyond petitioner's mere presence at the scene.  (Pet. at 6i.)  The Court of Appeal summarized this claim as follows:

> [Petitioner] claims he was a "passive observer," a " 'bystander' who was present at the scene of the offenses but took no active role in aiding the perpetration of the offenses; [he] . . . merely continued what he had been doing: Driving the Honda at a high rate of speed.  There is no evidence . . . that [he] did any affirmative act, apart from continuing to drive, that intentionally aided,

7

>abetted or encouraged Monsivais' assaults on the officers."
>
>[Petitioner] asserts that his "mere act of continuing to drive the Honda, while Monsivais fired at the officers," may not be used to establish liability on an aiding and abetting theory because it "would impose a duty upon an innocent bystander (including one who happened to be driving a car who observed criminal activity in progress) a duty to act *affirmatively* to intervene in the unlawful act of the actual perpetrator. . . ."

(Ex. 3 at 14-15 (emphasis in original).)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Consequently, where a state prisoner alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, id. at 324. For purposes of determining such claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). Where the record supports conflicting inferences, a federal habeas court must presume the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution. Id. at 326. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. Id. at 324.

Under California law, a person is guilty as an aider and abettor when he or she "act[s] with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." People v. Beeman, 35 Cal. 3d 547, 560 (1984) (emphasis in original). Aiding and abetting may be shown by circumstantial evidence such as "presence at the scene of the crime, companionship, and conduct before and after the offense." In re Lynette G., 54 Cal. App. 3d 1087, 1094 (1976). While presence at the crime scene is not sufficient to support a finding of aiding and abetting, it is one factor showing intent. See People v. Hill, 17 Cal. 4th 800, 851-

1  52 (1998). Another factor is the "failure to take steps to prevent the commission of the
2  crime." People v. Pitts, 223 Cal. App. 3d 606, 893 (1990).
3      Here, there was substantial evidence to support a finding that petitioner aided and
4  abetted Monsivais in the shooting. First, at the time of the shooting, petitioner and Monsivais
5  had known each other for two months and both were Sureño gang members. (Ex. 2 at 890,
6  893-94, 1007, 1015.) Second, petitioner participated in numerous crimes with Monsivais
7  before and during the shooting. For example: (1) Monsivais admitted taking part in the
8  July 21 7-Eleven robbery and petitioner was recognized as a co-participant on the
9  surveillance tape (id. at 624-26); (2) Monsivais stole the blue Ford Escort on July 20, which
10 was the vehicle he and petitioner used in the 7-Eleven robbery the next day (id. at 616);
11 (3) petitioner was driving Angel Rocha's Honda Accord at the time of the shooting, which
12 car Monsivais admitted was stolen (id. at 596, 611); and (4) petitioner was driving in excess
13 of 100 miles per hour when he and Monsivais were fleeing from the police (id. at 597).
14 Third, while Monsivais was firing at the CHP officers, petitioner made no effort to slow
15 down, stop the car, or stop the shooting. (Id. at 598, 896,1013.) Finally, after the shooting,
16 petitioner crashed the car into an embankment and continued to flee from the officers on foot
17 with Monsivais. (Id. at 311-15.) Given petitioner's presence at the scene of the crime, his
18 companionship with Monsivais, and his conduct before, during, and after the shooting, a
19 rational trier of fact could find petitioner aided and abetted Monsivais.
20      Accordingly, petitioner is not entitled to habeas relief on this claim.
21      2.     Ineffective Assistance of Trial Counsel
22      Petitioner claims his trial counsel was constitutionally ineffective for failing to object
23 to Detective Bryan's identification of petitioner from the 7-Eleven surveillance tape, which,
24 for technical reasons, as noted, could not be produced at trial. (Pet. at 6i.) This Court
25 assumes petitioner is making the same argument here that he made on direct appeal,
26 specifically, that his trial counsel should have made two objections: a hearsay objection and a
27 Confrontation Clause objection. (See Ex. 3 at 19, 23.) The Court of Appeal summarized the
28 background for this claim as follows:

9

> Bochas, the sole percipient victim-witness who testified to the 7-Eleven robbery, said his back was to the counter and he did not see the robbers and was afraid to look, so he was unable to identify either of the robbers from the videotape of the event.
>
> Monsivais, the sole participant-witness, had admitted to Bryan that he robbed the [7-Eleven] clerks at gunpoint and explained how the robbery was committed even though he did not repeat this evidence at trial. He did state that everything shown on the tape was correct. Bryan's testimony of the robbery was based on Monsivais's statement and the tape of the robbery. Because "[t]here was a technical issue," the video was not available for trial.
>
> . . .
>
> In the complained of testimony, Bryan stated that he viewed the videotape at the 7-Eleven store and compared the second robber in that robbery to [petitioner], the robber shown in the Valley Truck Stop robbery tape and identified by Sylvia, the clerk and percipient witness to the Valley Truck stop robbery. Bryan described the second 7-Eleven robber as "an extremely large man. Very tall. Heavy set. Had a baseball cap pulled down very low over his eyes concealing his face. Slumped shoulders." Bryan stated he was certain that the second robber was [petitioner] "but I couldn't identify him by face."

(Ex. 3 at 18-19.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test "if the petitioner cannot even establish incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged

10

deficiencies." Strickland, 466 U.S. at 697.

A "doubly" deferential judicial review applies in analyzing ineffective assistance of counsel claims under 28 U.S.C. § 2254. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11 (2011). The rule of Strickland, i.e., that a defense counsel's effectiveness is reviewed with great deference, coupled with AEDPA's deferential standard, results in double deference. See Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010). Put another way, when § 2254(d) applies, "the question is not whether counsel's actions were reasonable[;] [t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011). Moreover, because Strickland's standard for assessing defense counsel's effectiveness is a "general" one, state courts have "greater leeway in reasonably applying that rule," which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." See Cheney, 614 F.3d at 995 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Here, petitioner fails to show counsel's actions fell below "an objective standard of reasonableness." See Strickland, 466 U.S. at 688.

### a. Hearsay Objection

First, an objection to Detective Bryan's identification testimony on hearsay grounds would have failed. The Court of Appeal determined Detective Bryan's identification testimony was "admissible as a hearsay exception as a matter of state law" (Ex. 3 at 23) because it was a "writing" properly authenticated by testimony given at trial by Monsivais (id. at 22-23); cf. Ashford v. Culver City Unified School Dist., 130 Cal.App. 4th 344, 349-50 (2005) (holding "unauthenticated videotapes" improperly admitted). In particular, as discussed by the Court of Appeal, Detective Bryan, who interviewed Monsivais after the arrest, testified that Monsivais's description of the robbery was, with limited exception,[4] the same as the events depicted in the videotape, and Monsivais testified that what he told Detective Bryan about the robbery was true. (See Ex. 3 at 22); see also Jones v. City of Los

---

[4] In the interview, Monsivais did not state he had an accomplice; at trial, he testified he omitted that fact in an effort to protect a fellow gang member. (Ex. 2 at 894-96.)

11

1  Angeles, 20 Cal. App. 4th 436, 441 (1993) ("Pursuant to [California] Evidence Code section 1400, it is sufficient to authenticate a . . . videotape if the proponent makes a showing the videotape is an accurate portrayal of what it purports to be."); Cal. Evid. Code § 1521(a) (providing "[t]he content of a writing may be proved by otherwise admissible secondary evidence").  This Court must defer to the California courts' interpretation of California law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding federal writ not available for alleged error in the interpretation or application of state law).

          b.     Objection Based on Confrontation Clause

An objection on Confrontation Clause grounds likewise would have failed.  The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  "It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing the crucible of cross-examination."  Crawford v. Washington, 541 U.S. 36, 61 (2004).  The Confrontation Clause applies to all "testimonial" statements.  Id. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Id. at 51 (internal quotation and citation omitted).

As the Court of Appeal noted, the United States Supreme Court, in Davis v. Washington, 547 U.S. 813 (2006), has further clarified the distinction between "testimonial" and "nontestimonial" statements.  (Ex. 3 at 23.)  In Davis, the Supreme Court determined a recording made by a 911 operator was nontestimonial because the victim was "speaking about events as they were actually happening," and call[ing] for help."  Davis, 547 U.S. at 827.  Given such circumstances, the Davis court found the "primary purpose" of the call was "not to establis[h] or prov[e] some past fact," but, rather, to "enable police assistance to meet an ongoing emergency," and, consequently, the Confrontation Clause did not bar its introduction into evidence.  Id. at 828 (alterations in original).

Here, although the Court of Appeal found the surveillance videotape's "primary purpose was to prove or establish the facts of the event it was recording for investigation and possible use at a trial" (Ex. 3 at 24), its introduction is not barred by the Confrontation

1  Clause. The Confrontation Clause, as noted, provides the accused the right to be confronted
2  by "the witnesses against him," U.S. Const. Amend. VI, and to test their statements "in the
3  crucible of cross-examination," Crawford, 541 U.S. at 61. "Because a camera is not a
4  witness that is amenable to cross-examination, and because a photograph . . . is not a
5  testimonial statement," the videotape here at issue does not implicate the Confrontation
6  Clause. See Sevin v. Parish of Jefferson, 621 F.Supp. 2d 372, 382 (E.D. La. 2009) (holding
7  photograph of vehicle taken by traffic camera not testimonial hearsay); Crawford, 541 U.S. at
8  51 (holding Confrontation Clause applies only to "testimonial statements").

9        In sum, both of petitioner's proposed objections in all likelihood would have been
10 futile. "[T]rial counsel cannot have been ineffective for failing to raise a meritless
11 objection." Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005). At a minimum, a
12 "reasonable argument" can be made that counsel satisfied Strickland's deferential standard."
13 Harrington, 131 S. Ct. at 788.

14       Accordingly, petitioner is not entitled to habeas relief on this claim.

15     3.     Statements by Petitioner's Brother

16       Petitioner claims the admission of statements made by his brother regarding
17 petitioner's gang membership violated his rights under the Confrontation Clause. (Pet. at
18 6ii.) The Court of Appeal summarized the background of this claim as follows:

> [Petitioner] contends the court erred in allowing gang expert Officer Royce Heath's statement, that [petitioner's] brother told him [petitioner] was a gang member, to be used as part of the basis for Heath's expert opinion that [petitioner] was, in fact, a gang member. [Petitioner] asserts that this evidence to prove alleged gang associations and thus the gang enhancements alleged under Penal Code section 186.22, subdivision (b), denied him his rights to due process and confrontation in violation of the federal and state Constitutions and *Crawford* . . . .
>
> In a motion in limine before Heath testified about gang conduct, practices, membership, and indicia of membership, and [petitioner's] connection to a gang, [petitioner's] counsel moved to exclude mention of a June 2003 contact between Heath and [petitioner's] brother (unnamed at trial, called "X" here) in which X stated that [petitioner] was a gang member with a "13 tattoo about his left eye" and identified [petitioner] as a suspect in a theft of property from X and other family members. Counsel requested that references to [petitioner] as a suspect in the theft be excluded as irrelevant and more prejudicial than probative. (§ 352.) The court allowed Heath to refer to the statement as part of the basis of his opinion but forbade mention that [petitioner] was a suspect in a

13

> theft.
>
> Defense counsel also objected that X's statement was not reliable and was biased and that it should be eliminated from the officer's opinion and consideration. The court stated that X's possible bias was a question of the weight of the evidence and not its admissibility.
>
> During trial, Heath was asked if he researched [petitioner's] record for police contacts with or about [petitioner] that would have been considered gang related. Heath mentioned a July 3, 2003 [*sic*, June 2003, *ante*] police contact with X who explained that part of the fear that he had was that [petitioner] was a gang member and he specifically pointed out to the officer that [petitioner] had "the Roman Numeral 13 tattooed on his face." Heath's testimony included other contacts and observations on other occasions.

(Ex. 3 at 25-26 (footnote omitted).)

The Court of Appeal agreed the admission of X's statement constituted a Confrontation Clause violation because "it was admitted for the truth of the matter asserted, that [petitioner] was a gang member, and X was not available for cross-examination." (Ex. 3 at 29.) The Court of Appeal nonetheless rejected petitioner's claim, finding, given the overwhelming admissible evidence of petitioner's gang membership, that the introduction of X's statement did not prejudice petitioner at trial. (Id. at 30-32.)

"Confrontation Clause violations are subject to harmless error analysis." United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004); see also United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard is whether the allegedly inadmissible evidence "'had substantial and injurious effect or influence in determining the jury's verdict.'" See Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Here, accepting the Court of Appeal's conclusion that admission of the statement was improper, this Court, for reasons similar to those expressed by the Court of Appeal, agrees such error was harmless. Specifically, even without the statement by petitioner's brother, the evidence of petitioner's membership in the Sureño gang was exceptionally strong. The Court of Appeal summarized that evidence as follows:

> [T]he evidence that [petitioner] was a Sureño gang member was overwhelming. He associated with Monsivais who was a gang member. When [petitioner] was arrested, he admitted he associated with Sureños and he was wearing a blue sweatshirt, the gang color.

> His body advertised his gang membership. He had unmissable tattoos on his face, head, neck, back, hands, and arms. Photographs showed three dots next to the left eye and above the left eye, the Roman numeral "XIII" and the 13th letter of the alphabet, "M" for "Mexican mafia." "Salinas" was tattooed on his neck. A "very large" "13" was on the back of his head "with the head shaved so that that can be easily displayed and his association shown. Directly below that . . . [his gang moniker] Mr. Baby Face . . . on his back." [Petitioner] also had "brown" tattooed on his back, often used as "brown pride" or in his case, "brown and proud." His arms had tattoos that, taken together, read "south side 13." He had a "3" on a middle finger. Finally, his clothing, manner, and demeanor broadcast a message making a person seeing him on the street think he was a Sureño member.
>
> In contacts with [petitioner] from 1994 to the time of the trial in 2004, police recorded that in November 2000, [petitioner] was wearing blue clothing, and carried a small tape recorder with his moniker and gang slogans or sayings carved into the tape recorder itself. He also admitted belonging to a new Sureño gang called "South Side Trece." In June 2000, [petitioner] was contacted in the company of admitted and certified gang members. He hung out on a specified street controlled and frequented by Sureños. In 1998, [petitioner] admitted he was a La Posada Trece Sureño gang member. Heath stated [petitioner] also admitted associating with southerners and said that northerners or Norteños are his enemies.
>
> The 2004 Valley Truck Stop robbery involved gang colors and the use of a firearm. Heath stated the use of firearms in connection with crimes is meant to cause fear and intimidation in victims and witnesses as a means of dissuading them from testifying or coming forward with information. Excluding the July 2003 contact with X, six months earlier in January 2002, there was a contact with [petitioner] in which he was wearing blue clothing and a belt with a silver or chrome buckle reading "S" for Sureño.

(Ex. 3 at 31-32 (footnote omitted).) In sum, given the overwhelming evidence of petitioner's gang membership, it cannot be said the admission of his brother's statement had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. at 637.

Accordingly, petitioner is not entitled to habeas relief on this claim.

4.   Sufficiency of Evidence: Predicate Offenses[5]

Petitioner claims there was insufficient evidence to support the jury's findings on the gang enhancements. (Pet. at 6ii.) The Court of Appeal summarized and rejected this claim as follows:

---

[5] The term "predicate offenses" describes the list of crimes that satisfy the "pattern of criminal gang activity" requirement for purposes of a gang enhancement under Penal Code section 186.22(b)(1). People v. Gardeley, 14 Cal. 4th 605, 610 n.1 (1996).

15

> [Petitioner] states that his gang enhancements must be stricken because the prosecution did not present evidence that he had knowledge of the "predicate offenses." [Petitioner] states that punishing him for promoting conduct by gang members (Pen.Code, § 186.22, subd. (b)(1), (5), hereafter, section 186.22(a), (b), etc.) when there is no proof that he knew of facts that rendered his activity "gang activity" (i.e., the predicate acts) violated his state and federal due process rights.
>
> [Petitioner] acknowledges that it has been held that proof of the defendant's knowledge of the "predicate acts" is not a condition precedent to imposition of a "gang" enhancement. (See *People v. Gamez* (1991) 235 Cal.App.3d 957, 974-975 (*Gamez*), disapproved on other grounds in *Gardeley*, *supra*, 14 Cal.4th at p. 624, fn. 10.) Nevertheless, [petitioner] states these cases rely on federal authority interpreting and upholding RICO (Racketeer Influenced Corrupt Organizations) statutes. (18 U.S.C. § 1961.)
>
> . . .
>
> In California, in order to impose enhanced punishment for persons who participate in a gang knowing that its members have engaged in "a pattern of criminal gang activity," and who are convicted of a crime "committed for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22(a), (b)(1)), the prosecution must prove that gang members have committed two or more of the criminal offenses specified in section 186.22(e) (such as robbery, section 186.22(e)(2)), within a particular time period, or a single offense committed by two or more persons on the same occasion. (*Gardeley*, *supra*, 14 Cal.4th at p. 610.)
>
> The prosecution may rely on the "current offense for the purpose of establishing a pattern." (*Gardeley*, *supra*, 14 Cal.4th at p. 625.) Evidence of the offense with which the defendant is charged and proof of another offense committed on the same occasion by a fellow gang member can establish the requisite pattern. (*People v. Loeun* (1997) 17 Cal.4th 1, 5.)
>
> So, "[w]hile Officer Heath did testify about the criminal activities of the Sureño gang". . ., he did so in response to a question asking him to give examples of the "'primary activities of the Sureño criminal street gang.'" (*Gardeley*, *supra*, 14 Cal.4th at ¶. 617-620 (expert permitted to testify as to gang's "primary activities").) The "predicate offenses" about which Heath testified, after listing the gang's primary activities, were those committed by [petitioner] and Monsivais on July 27, 2004: robbery, driving a stolen car, and shooting at an occupied vehicle and shooting from a motor vehicle. (§ 186.22(e)(1) (assault with a deadly weapon), (e)(2) (robbery), (e)(5) (shooting at an occupied motor vehicle), (e)(6) (discharging or permitting the discharge of a firearm from a motor vehicle), (e)(10) (grand theft of any firearm, or vehicle).)
>
> Although there is no requirement that the prosecution prove that the defendant knew of the gang's "primary activities," this evidence rebuts [petitioner's] claim that he did not "knowingly further[] the ends of his 'gang' as that term is defined by statute." There was no error.

(Ex. 3 at 33-35 (footnote omitted).)

As discussed above, the relevant inquiry regarding a claim insufficiency of evidence is

whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Under California law, a gang enhancement is imposed on a "person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b)(1).[6] As noted by the Court of Appeal, proof of the defendant's knowledge of the "predicate offenses" is not a condition precedent to imposition of a gang enhancement. See People v. Gamez, 235 Cal. App. 3d 957, 974-75 (1991), disapproved on other grounds in People v. Gardeley, 14 Cal. 4th 605, 624 n.10 (1996) . Rather, in order to show a "pattern of criminal gang activity," the prosecution must prove gang members have "within a certain time frame, committed or attempted to commit two or more of specified criminal offenses." Gardeley, 14 Cal. 4th at 610 (internal quotation and citation omitted). Evidence of the current offense "and proof of another offense committed on the same occasion by a fellow gang member" can establish the requisite pattern. People v. Loeun, 17 Cal. 4th 1, 5 (1997).

As noted by the Court of Appeal, Officer Heath's testimony as to the criminal activities of other Sureño gang members was elicited to provide examples of the "primary activities" of the Sureño gang, not as proof of the requisite "predicate offenses." (See Ex 2 at 810-19; see also Cal. Penal Code § 186.22(f) (defining "criminal street gang" as group "having as one of its primary activities the commission of one or more of the criminal acts enumerated [therein]"). The "predicate offenses" in evidence were those committed by petitioner and Monsivais on July 27, 2004, relating to the shooting of the CHP officers, and on July 21, 2004, relating to the 7-Eleven robbery. (See Ex. 2 at 824-25.) Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find the

---

[6] A "criminal street gang" is a group "having a common name or common identifying sign" (1) whose "primary activities" include the commission of specified criminal acts and (2) whose members engage in a "pattern of criminal gang activity." Cal. Penal Code § 186.22(f).

17

predicate offenses were committed and, as a result, could find the gang enhancements true.

Accordingly, petitioner is not entitled to habeas relief on this claim.

C.  Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy      § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED, and a certificate of appealability is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Warden Mike McDonald on the docket as the respondent in this action.

The Clerk is further directed to change petitioner's address to Marcos Amparo, #T-66640, High Desert State Prison, P.O. Box 3030, Susanville, CA 96127-3030.

IT IS SO ORDERED.

DATED: March 30, 2012

_____
MAXINE M. CHESNEY
United States District Judge